Thank you. The United States Court of Appeals for the Ninth Circuit is now in session. Thank you. As we begin, I just want to welcome Judge Gilman on behalf of Judge Collins and me. Thank you so much for lending your help to the Ninth Circuit. We appreciate it and it's always a pleasure to sit with you. I'm pleased to be here. Thank you. Our first argued case this morning is American Wild Horse Campaign v. Bernhardt. Counsel, begin when you're ready. Thank you, Your Honor. May it please the Court, as William Lawton, appearing for the Plaintiff's Appellant's American Wild Horse Campaign and Kimmerly Curl, I would like to reserve three minutes for rebuttal, with the Court's permission. I will focus this argument on the issues that were identified in the Court's order of April 10th, which are first, whether an EIS is necessary because gelding has impacts that are highly uncertain or involve unique or unknown risks, and second, whether BLM's failure to consider vasectomy as an alternative to gelding rendered its decision arbitrary and capricious. As I'll explain, the answer to both questions is yes. Turning first to uncertainty, I'd like to briefly underscore the, quote, low standard that plaintiffs face here. I'm quoting from California Wilderness Coalition v. U.S. Department of Energy, which is cited in the briefs. The quote is, if the plaintiff raises substantial questions whether a project may have a significant effect, an EIS must be prepared. Here, plaintiffs go well beyond this low standard in showing that gelding's impacts are highly uncertain for three principal reasons. First, underlying scientific evidence, including evidence commissioned by BLM itself, shows that gelding's impacts remain unstudied and poorly understood. This evidence includes a seminal report from the National Academy of Sciences, which BLM itself commissioned, and which found that, and I'm quoting here from ER203, the effect that gelding a portion of the males in a herd would have on reproduction and behavior could not be predicted. Likewise, BLM's own study of gelding's impacts, which the agency began in 2016, but which had not yielded any information by the time BLM decided to implement gelding in this decision, that gelding study stated, and I'm quoting here from ER171, that it is, quote, unknown what effect gelding an adult stallion and releasing him back into a wild horse population will have on his behavior and that of the wider population. Additionally... Can I ask you a question? It seems to me sort of indisputable that there is uncertainty about the effect of placing gelded stallions back into the herd, but my question is about how important that is to the overall project. In other words, complete uncertainty about something tangential or trivial still doesn't require an EIS. It has to be germane to something important. That's the issue I would appreciate your addressing. I don't mean to interrupt your flow. You're welcome to go back to the other reasons, but I would like you to address that question. Yes, Your Honor. I appreciate the question. It's very well taken. Here it is the case that the uncertainty about gelding goes straight to the heart of BLM's own goals for this project. I'll highlight first a quotation from the National Academy of Sciences, which showed that it is... I'm sorry. It's from BLM itself, actually. It showed that geldings may over-concentrate in prime habitat or near water sources. This is extremely important because if that happens, then the decision to release gelding may fundamentally undermine BLM's own goal of improving rangeland conditions. Likewise, the National Academy of Sciences advised BLM, but BLM did not consider, that gelding may actually increase a herd's reproductive success. Now, if that's the case, then the decision to include gelding may completely undermine BLM's own goal of slowing population growth and reducing the need for additional gathers. In at least two ways, these uncertainties go straight to the heart of what BLM aims to accomplish and indicates that the decision to include geldings may actually fundamentally undermine BLM's own goals. Additionally, evidence from both the National Academy of Sciences and from AWHC's experts that they put into the record, show that gelding may have extremely severe impacts on wild horse behavior. AWHC maintains that those effects, if they turn out to be true, are contrary to Congress's intent to protect wild horses, including their behavior. I'd like to highlight how these facts are very similar to the facts that led this court to recently require an environmental impact statement in BARC v. United States Forest Service. There, scientific evidence in the record showed that a certain form of logging would undermine the Forest Service's goal of suppressing forest fires, but the Forest Service failed to meaningfully consider that scientific evidence, and as a result, this court found that the Forest Service's decision was both highly uncertain and highly controversial. Now, the same outcome is warranted here for essentially the same reasons. Scientific evidence in the record, including the National Academy of Sciences report and BLM's own findings when embarking on its own study of gelding's impacts, show that gelding may fundamentally undermine BLM's own goals for this project, but BLM failed to meaningfully consider that evidence. I'm sorry, go ahead. I'm just curious, how could gelding possibly increase the herd? I guess if you castrate a horse, how is that going to possibly increase the herd? That's a good question, Your Honor. It does seem a little counterintuitive, doesn't it? However, the National Academy of Sciences explicitly warned about this at excerpts of Record 203, and it showed that gelding could increase aggression and competition among horses in the herd or reduce it. My understanding is that it's the reduced competition for mating, essentially, that would result in increased population growth. It's a little bit speculative. I gather there's been no study that's actually confirmed an increase. There has been. My understanding is that there are no studies that confirm whether gelding has any impact on slowing population growth or increasing population growth, which is one reason that... Let me get back to the question that Judge Graber had asked you originally. The big picture here of the whole gather is to reduce the size of the herd. I think they're saying the ideal herd should be about 1,700 wild horses, and they've got 8,600 wild horses. Now, maybe alternative to gelding, would it be to euthanize or shoot a whole bunch of horses to reduce it? Is that a solution from your viewpoint? Well, the American Wild Horse Campaign does not endorse euthanasia for wild horses. As a legal matter, that's not on the table for BLM because Congress has consistently in appropriation bills said that BLM may not expend resources on the euthanasia of healthy wild horses. No, but we do believe there are other alternatives that BLM failed to consider, including a more rigorous use of PZP vaccines on females, which the National Academy of Science has identified as one of the most promising fertility control methods, and vasectomy, which the National Academy of Science has also identified as one of the most promising alternatives. Excuse me. It recognized some problems with vasectomy, did it not? Well, the National Academy of Science's report noted that some additional research would be necessary, but it said the same thing about gelding, and it noted specifically that vasectomy would be a superior alternative to gelding based on their view of the science. Additionally, BLM nowhere in the record has explained that it eliminated vasectomy from consideration, for example, because of the need for additional research. That's not in the EA or the record of decision or the finding of no significant impact. I have one more question for you about this area. If we were to agree with you on the uncertainty matter, and thus requiring EIS, would we have to reach the other issues in the case? No, Your Honor. An EIS would sufficiently remedy all of the issues that AWHC has raised in this case. In addition, for example, to requiring the consideration of the scientific evidence that AWHC maintains that BLM ignored, it would require a rigorous examination of all viable alternatives, including vasectomy. Before I move on, I'd like to really highlight how clearly the NAS report brought up the issue of vasectomy. In fact, the NAS notes that it was a specific assignment of task that BLM gave to the NAS. This is at ER197, where the NAS recounts the specific questions that BLM asked the report to consider. That includes, when managing a herd with reproducing and non-reproducing animals, which options should be considered, including gelding and vasectomy. Then, the NAS report, only six pages in, in what it characterizes as a key finding, old-faced print, and this is at ER200, stated that the most promising fertility control methods are PZP vaccines, Gonicon vaccines, and vasectomy. Now, BLM demonstrated that it clearly knew about this finding, because it cited the NAS report to support its decision to use PZP and Gonicon. That's at ER84 and ER97 through 98, where the agency said that the National Academy of Sciences concluded that PZP and Gonicon were a good choice. Now, that is in the same old-faced key finding, where the NAS report also identified vasectomy as well. I see that I am approaching the three minutes that I have asked to reserve for rebuttal, so unless the court has any other questions they'd like me to answer right now, I'll reserve these three minutes. I don't believe we do. You may reserve. Good morning, and may it please the court. My name is Anna Katselis, and I represent the United States Bureau of Land Management. The court has asked the parties to address two issues, and I will plan to devote all of my time to those issues, but briefly, if I may, I believe that some background about the act and about this plan would be helpful to the court. The Wild Free-Roaming Horses and Burros Act charges BLM with managing wild horse populations to achieve and maintain a thriving natural ecological balance on the public lands. To achieve that goal, BLM establishes appropriate management levels for particular herd management areas, and then utilizes roundups and fertility control methods as necessary to achieve those levels. BLM is required to immediately remove excess animals whenever, on the basis of all information currently available to the agency, it determines that an overpopulation exists and that action is necessary to remove excess animals, and that is what BLM has done here. The act grants BLM quite broad discretion as how it goes about that task, and the incorporation of fertility controls to slow population growth and ultimately reduce the number of horses requiring removal is consistent with the recommendations of numerous entities, including the National Academy of Sciences and the Humane Society of the United States. Now, of course, your honors, BLM does face an incredibly difficult management task. Judge when it undertakes a removal action, first to put those animals for which sufficient adoption demand exists up for adoption. The second thing that BLM is supposed to do, and this is 16 U.S.C. 1333 B2C, is euthanize the rest of the animals, but BLM cannot do that. BLM has been prohibited in its appropriation statutes consistently from using euthanasia to destroy healthy animals, so BLM faces a very difficult management task, and here, for example, as of December 2017, these complexes contained approximately 9,500 wild horses, and the appropriate management level is a range from 899 to 1,678. BLM determined, quite obviously on that information, that there is an overpopulation and that action is necessary to remove excess animals. Why isn't it the case that the record shows at least sufficient uncertainty about the natural world, and that an environmental impact statement was warranted? Your honor, quite simply, I'd like to begin first with the standard on that question. This court has explained quite clearly that an EIS is not required merely because that quotient of uncertainty, which is always present when making predictions about the natural world, exists, and that is all that exists here. Gelding is well-established, safe, highly effective surgical procedure that has been performed... Well, that's true for the individual animal, of course, but the question isn't really about the safety of the surgery for the individual animal. It has to do with the remainder of the population that remains in the wild herd, and as to that, it seems to me there's almost entirely uncertainty, or there was at the time that this EA was prepared. BLM, the uncertainty in this case, now first of all, I would direct the court to the record, two supplemental excerpts of record, pages 170 to 176. There is extensive scientific literature. There are many studies on horses and gelding. There are not studies on wild horses. However, BLM conducted an extensive review of the available scientific literature and made reasoned predictions based on that. Now, BLM, for example, explained that stallion-like behavior is common, is quite common, even in domestic horses, and they are typically gelded before or shortly after puberty. Then it also studied studies of pasture horses, for example, in which some geldings were dominant and some geldings were not, which support the conclusion that social experiences prior to gelding affect behavior after gelding. Respectfully, your honors, it's really quite a common sense proposition here. Horses, like other species, are products of their environment. The record, again, to look at these pages specifically, BLM conducted a very careful, thorough review of the available scientific information and made a reasoned prediction based on it. Now, a couple points. What is the uncertainty here? BLM acknowledged that it cannot predict exactly what effect releasing a gelding to the range will have on an individual horse's behavior and that of the wider population. Your honors, that is a far cry. BLM is studying that for purposes of improving its wild horse management program. The fact that BLM is studying an effect in order to improve its management does not make that effect significant for purposes of NEPA. We would direct the court to, when you compare the cases that have found highly uncertain and unique and unknown ... You are the only participant. ... in this case, the effects at issue here are a far cry. The point of this factor, the unique and unknown risk factor, is to determine whether the effects are severe or intense. I think it's very important to keep that in mind because there is these effects. American Wild Horse Campaign relies, for example, on National Conservation ... National Parks Association v. Babbitt. Now, there, your honors, there was a proposal to increase cruise ship traffic into Glacier Bay National Park and Preserve by up to 72%. There were studies in the record, including the agency's own studies, that showed that would have severe impacts on threatened and endangered species, cause an increased risk of vessel collisions and oil spills. There are no comparable effects here. BARC is also helpful in how different the effects are. There, you had studies again, or there was evidence in the record undermining the agency's conclusion, and the effects went to fire management, which the court explained is severely important, has severe impacts, and is a matter of essentially life and death. The effects here aren't at that level, and this case is also distinguishable in the fact that there is no evidence in the record undermining BLM's conclusions. The NAS report reaches no conclusion as to the effects of gelding, and the statement ... What about vasectomy as an alternative, as your opposing counsel points out? On that issue, and I'll segue a little bit, but first, it's important. The campaign has never argued on appeal, or at any point in this litigation, that BLM was required to have been forfeited, and the court should not reach it. In fact, in its comments on the EA, and this is at ER-123 and supplemental ... I'm sorry, ER-130 and 131, the campaign in fact underscored the NAS report's clear statement that vasectomy is not an alternative available for current use by BLM, in advocating instead that BLM rely exclusively on PZP. The campaign has never argued that BLM should consider vasectomy. It never raised that issue during the administrative process. It never made that argument in the district court or on appeal. We urge the court not to consider that, because it's not raised. If the court does consider that, the arbitrary and capricious standard of review, it is sufficient for an agency, as long as its path may reasonably be discerned. It is quite clear in the administrative record that chemical vasectomy is not available for use. It has not been tested on horses at all. It's just not something. Overall, the NAS report is a programmatic, forward-looking report that looks at a number of possible fertility control, but it does not recommend that BLM use an untested measure. BLM reasonably limited its discussion to well-understood available methods, which include gelding, Gonicon, and PZP, and rationally explain that among them, gelding is one method that does not require multiple handling occasions to achieve long-term infertility, and is accordingly consistent with the Wild Horse Act's requirement that management be at the minimum feasible level necessary to attain management objectives, and that is 2 SCR 176. Judge Gilman, you did ask about vasectomy, and doesn't the NAS report also indicate, I believe it was Judge Gilman, that there are problems with it, and that is in fact true. Most broadly, the report explains that all available fertility control methods affect wild horse physiology and behavior to some degree, including vasectomy, and with respect to vasectomy, it states that having vasectomized males in a population may increase the number of months that males seek to mate, which could increase the risk of injury, result in compromised body conditions due to less time spent foraging, and possibly lower winter survival rates of males. In turn, the lower male winter survival rates, it states, would be likely to have a number of consequences for population dynamics, including less stable harems, and possible increased harassment of females. It plainly does not, again, say that vasectomy is a great method, and gelding is a terrible method. That's not what the record indicates, and again, it's very clear that vasectomy is not available, and particularly given that it was not raised to BLM at any point in the process, or ever argued in this case, the court should not reach that issue. I gather that sterilization of the female horses be the solution, as opposed to gelding. Well, Your Honor, I mean, respectfully, BLM is studying the tools that Congress plainly, expressly authorized it to use. In the Wild Horse Act, and again, whether BLM, particularly with respect to NEPA, but also with respect to the Wild Horse Act, under the APA, the court may not substitute its judgment for BLM's. And here, in this case, in this gather plan, the primary reason that BLM authorized the release of geldings to the range, which, by the way, the agency has not done to date under this gather plan, but is simply to allow a larger number of them to remain in the wild. So, respectfully, what it really is, is just a management tool, a decision, rather than- The issue isn't whether we think the ultimate policy choice is a good one. The only issue really is whether a fuller explanation and study were required in the form of an EIS. So we're not really trying to judge the end result. We're here to figure out if it was enough to say, well, we're just going to do this quicker version, because there's no significant impact. And so it may be that the result would be the same. We have no way to know that. But the issue really is whether the process was sufficient. And your Honor, respectfully, it was. This is a 364-page environmental assessment with a thorough discussion of the available scientific literature. And there is a lot of scientific literature on the effects. BLM recognized that there is some uncertainty, but respectfully, Your Honor, there always is. But BLM- Can I ask one question? Yes. Can I ask one question that I'm just curious, before your time runs out? You know, the statute on EISs applies to any major federal action significantly affecting the quality of the human environment. How is the significance of the fact that it says the word human environment? Is there any to that? Well, Your Honor, I think that, I believe that the impacts on animals fall within the human environment. But it does orient the Court here to consider, and it bears mentioning that the point of this whole plan is to forestall environmental damage, prevent animal suffering, which is occurring because of this overpopulation, and to restore a thriving natural ecological balance to the range. This is attempting to do good environmentally, and respectfully, Your Honors, that is significant. And BLM, and certainly for purposes of NEPA, BLM adequately discussed and analyzed the limited gelding component. And there is some uncertainty, as there always is, but it doesn't rise to the level of establishing that the effects on the environment, and again, we would urge the Court to compare the effects at issue here with those at issue in National Parks Association, and also BARC, because it illustrates by contrast that these effects just do not rise to that level. And again, BLM did... Thank you, counsel. You have exceeded your time. I wasn't sure that Judge Gilman is still here. I don't see his picture anymore. Could I ask our IT people to please determine whether Judge Gilman is connected? There you are. There he is. Excellent. Okay, thank you. I'm sorry. You're muted. Unmute yourself. I did not mute myself. Can you hear me? The IT people must have muted you, but they've unmuted you now, so go ahead. Wonderful. Excellent. Okay, thank you. I'd like to focus my rebuttal on explaining why an EIS is going to be an especially valuable exercise for BLM here, and in doing so, explain some key deficiencies in the argument we just heard from opposing counsel. One is the notion that BLM ostensibly engaged in its own extensive scientific review. Now, opposing counsel directed the Court's attention to a span of pages in BLM's EA, and the presence of numerous scientific studies there. However, if the Court examines those studies, it will find that the BLM did not cite, as defendants have conceded in their brief at page 37, did not cite the National Academy of Sciences report, and that the overwhelming majority of the scientific resources that were cited predate the National Academy of Sciences report. So the notion that they engaged in a comprehensive review while ignoring their own seminal report that they themselves commissioned is erroneous. I'd also note that there are only two studies that post-date the NAS report. One of them is BLM's own incomplete study of gelding's impacts, which highlights why the impacts remain uncertain, and the other is a 2016 study which showed that vasectomy, not gelding, has some impact on reducing population growth rates. So I'd like to use that to pivot to the vasectomy notion, and the government has asserted that AWHC has forfeited the vasectomy issue. That's far from the truth. The vasectomy issue appears in the briefs before this court. I believe it's on page 31 through 32 of Appellate's opening brief. It appears in the complaint, I believe at paragraph 33, where AWHC quotes the NAS's findings on vasectomy, and it appears clearly in AWHC's comments on the project, which stressed that BLM needed to prepare an EIS that was more consistent with the NAS's findings. Do you have a record site for where in the administrative record it was raised below? Yes, Your Honor. I most certainly do. So at ER 147, we have AWHC saying that BLM needs to, quote, present an EIS that fully analyzes all impacts and alternatives, and that is aligned with the NAS recommendation. And at ER 123 through 24, we have AWHC specifically quoting the NAS report on vasectomy, and that also occurs at ER 131 through 32. So, here, we believe that an EIS would be an extremely valuable exercise, because it would allow the BLM to meaningfully consider the scientific evidence that the agency wrongfully did not attend to during this process, including the National Academy of Sciences report, and would require the agency to fully consider all alternatives. Thank you, counsel. The case just argued is submitted, and we appreciate very much the helpful comments from both of you.
judges: Gilman, Graber, Collins